# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-DP-00087-SCT

*DAVID COX*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2012 |
| TRIAL JUDGE: | HON. JOHN ANDREW GREGORY |
| TRIAL COURT ATTORNEYS: | JOHN KELLY LUTHER |
| | THOMAS ROY TROUT |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | KELSEY LEVOIL RUSHING |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CAMERON LEIGH BENTON |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 06/25/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     David Cox was indicted in an eight-count indictment for capital murder, kidnapping (two counts), sexual battery (three counts), burglary, and firing into an occupied dwelling. Cox was declared competent to stand trial. Cox pleaded guilty to all charges, including capital murder. As the State sought the death penalty, a jury was empaneled to determine his sentence. The jury returned a verdict of death, and the trial court entered a death sentence.

# BACKGROUND[1]

¶2.    David Cox ("Cox") and Kim Cox ("Kim") had two children of their marriage, D.C. and J.C. Cox was the stepfather of Kim's daughter, L.K., born in April 1998.[2] Kim and Cox separated in 2009 after L.K. told Kim that Cox had raped her.  Kim reported the crime to local law enforcement. In August 2009, Cox was arrested on charges of statutory rape, sexual battery, child abuse, possession of precursors, and possession of methamphetamine. During his nine months in jail prior to posting bond, Cox often would become enraged and would proclaim to his cellmates his hatred for Kim, blaming her for his incarceration. Cox professed to them that he would kill Kim once released. Because Kim feared Cox, she and the children moved in with her sister, Kristie Salmon.

¶3.    Cox was released on bond from the Pontotoc County Jail in April 2010. Cox was working as a commercial truck driver. On his way home on May 14, 2010, Cox purchased a .40 caliber hand gun and two extra magazines. Cox then borrowed a van from his sister and brother-in-law and went to Salmon's home. Cox shot his way into the home. Kim, L.K., D.C., J.C., and Salmon were at the home. J.C. and Salmon escaped and called for help. Kim, L.K., and D.C. were taken hostage by Cox for more than eight hours.

¶4.    The first 911 call was made at 7:10 p.m. Cox communicated with police throughout the night and early morning. Through those communications, police learned that Cox had shot Kim twice, once in the arm and once in the abdomen, between 7:00 p.m. and 7:10 p.m.

---

[1]These facts were developed from Cox's admissions at his guilty-plea hearing, evidence admitted during the sentencing trial, and contents of his appellate brief.

[2]L.K. was twelve years old at the time of the crime.

During the ordeal, Cox communicated with hostage negotiators, Kim's father and stepmother, and members of Cox's family. The last confirmation that Kim was still alive was at 12:45 a.m. on May 15. While Kim lay dying, Cox sexually assaulted L.K. in Kim's presence on three separate occasions.

¶5.    Agent Chris Jones of the Mississippi Bureau of Investigation testified that Cox cursed and screamed into the phone and stated that he was going to kill Kim and L.K. Cox threatened that if law enforcement entered, he would "be going for head shots," as he knew the officers would be wearing body armor. Cox also threatened that, if Jones called back, he would "shoot [L.K.] in the head."

¶6.    Officer Alan Chavers, a police officer and hostage negotiator for the Tupelo Police Department, testified that Cox told him that he had shot Kim in the stomach. Chavers encouraged Cox to release Kim for medical treatment. Unmoved, Cox said that he wanted to watch Kim die. Chavers testified that he repeatedly pleaded with Cox to release Kim. Cox replied, "since you're so interested in her . . . I want you to hear her beg before she dies." Kim also spoke with Chavers, pleading for her life. Chavers and Cox had several conversations in which Cox repeatedly said that he would not release Kim, because he wanted her to die. Cox also continued to threaten to kill the children if anyone tried to enter the home. Kim expressed her fear that Cox would follow through on his threats against the children.

¶7.    Cox also spoke with Kim's father, Benny, and Kim's stepmother, Melody. Cox told Benny that his original plan had been to kill Benny, Benny's other daughter, and Melody,

3

then to "go to Sherman and finish up and kill the rest of them." Cox told Benny that he "shot her and she was bleeding like a stuck pig." Benny spoke with Kim and she told him, "Daddy, I'm dying." Cox spoke with Melody multiple times, but he refused to speak to Benny again. Cox told Melody, "You f------ bitch, I hate your guts, but I hate his worse so this is the way it's going to be. You and me are going to do the talking. . . ." Melody testified that Cox taunted Kim while talking to Melody, saying, "Are you having fun yet, you bitch? Are you enjoying this? Is this fun, Kim?" Cox renewed his threats to "put a bullet in [L.K.'s] head."

¶8. Cox also talked to his sister and brother-in-law, bragging that he had shot "the bitch" and that he wanted her "to die a slow and painful death." Cox's brother-in-law, Michael, testified that he spoke with D.C., who told him that "Daddy hurt Mama." Michael also testified that Cox was yelling at L.K. and threatening to shoot her. Michael stated that Cox told him that he had a bullet for L.K. and for himself. Michael testified that he heard Kim say, "David, you know I'm dying," and Cox unmercifully responded, "I know you are."

¶9. Cox never released Kim for medical care, satisfying his depraved desire to see Kim suffer and die mercilessly. After negotiation attempts failed, a SWAT team entered the home at 3:23 a.m. Cox was taken into custody, L.K. and D.C. were removed from the scene, and Kim was found dead, having bled out as a result of the abdominal gunshot wound.

## **PROCEDURAL HISTORY**

¶10. Cox was indicted on a multicount indictment in the Circuit Court of Union County on one count of capital murder (murder while in the commission of kidnapping Kim Cox), two

4

counts of kidnapping of L.K. and D.C., one count of burglary, one count of firing into a dwelling, and three counts of sexual battery of L.K.

¶11. Cox was found competent to stand trial based, in part, on the opinion of Dr. Mark Webb, who had been retained by the Office of Capital Defense, and based in part upon the opinions of the staff of the state hospital at Whitfield, after they observed and tested Cox during a two-week observation stay.

¶12. Cox sought a change of venue, which was denied. The trial court found insufficient evidence was offered to support the change-of-venue claims of partiality and the inability to receive a fair trial. Cox offered two affidavits, one of which was Cox's, and four exhibits of dated local news reports, arguing the case had been highly publicized and that Kim's father and stepmother previously had served with local law enforcement. The trial court found that the State had met its burden of persuasion by offering witness testimony that no publicity had occurred since near the time of the crime, more than two years and four months before the trial. The trial court found convincing the testimony of four witnesses who testified Cox would have a fair trial and denied the motion "at this point," recognizing that voir dire had yet to take place.

¶13. Cox also filed pretrial motions to exclude evidence of victim-impact testimony, the autopsy reports, crime-scene photographs, and prior bad acts. The trial court ruled that portions of statements related to Cox's bad acts were admissible, after considering the Rule 403 "filter test." The State was limited to showing that Cox was incarcerated in Pontotoc County to develop the story surrounding the charged crime and evidence of "other purpose"

exceptions. The trial court ruled that the limited statements of Cox's cellmates would be admissible to establish motive and to provide the complete story surrounding the crime, which included Cox's statements faulting Kim and L.K. for his prior arrest and incarceration. It was during that incarceration that Cox planned to kill Kim upon release.[3] [4] Cox subsequently pleaded guilty to every charge.

¶14.    Before the sentencing trial, the trial court conducted an *ore tenus* hearing on the admissibility of L.K.'s videotaped forensic interview. The trial court entered an order finding that the video would be admissible. The trial court's order stated that it recognized that, pursuant to Mississippi Rule of Evidence 1101(b)(3), the Rules of Evidence did not apply to sentencing; however, out of an abundance of caution, the videotape was reviewed and deemed admissible pursuant to Mississippi Rule of Evidence 803(25) (the tender-years exception to the hearsay rule), and the court deemed it relevant to support the aggravator of "especially heinous, atrocious, or cruel."

¶15.    A jury trial commenced on September 17, 2012, to determine Cox's sentence on his capital-murder guilty plea. The trial concluded on September 22, 2012. The jury received testimony from police officers, investigators, SWAT team members, the 911 operator, Kristie

---

[3]The trial court later ordered both sides to present limiting instructions to the court. As to the forensic interview, the trial court ruled that a redacted version would be shown to the jury for the State to prove its aggravator of "especially heinous, atrocious, or cruel."

[4]The jury was instructed on seven aggravating factors pursuant to Mississippi Code Section 99-19-101(5): (1) that the defendant knowingly created a great risk of death to many persons; (2-6) that the defendant was in the commission of another felony, *i.e.*, the kidnapping of Kim, L.K., and D.C., the sexual battery of L.K., and burglary of the home; and (7) that the "capital offense was especially heinous, atrocious, or cruel." Miss. Code Ann. § 99-19-101(5) (Rev. 2007).

6

Salmon (Kim's sister), Benny Kirk (Kim's father), Melody Kirk (Kim's stepmother), L.K. (Kim's daughter and victim), Michael Houston (Cox's brother-in-law), Raymond Smith (Cox's neighbor and close friend), two of Cox's former cellmates, the coroner, child advocate Ellen Still, and Dr. H.F. Mason (designated as an expert in general surgery and penetrating gunshot wounds). Cox presented testimony from Hilda Smith (Cox's neighbor and close friend), Linda Carpenter (Cox's half-sister), Charlotte Houston (Cox's sister), John Owen (designated as an expert in drug, alcohol, and chemical dependency), and Dr. Mark Webb (designated as an expert in psychiatry). In rebuttal, the State offered testimony from Dr. Reb McMichael (designated as an expert in forensic psychiatry).

¶16.   The jury returned a unanimous verdict sentencing Cox to death.  The trial court entered an order in accordance with the verdict. The trial court sentenced Cox on all other charges. Thereafter, Cox moved the trial court for a new trial. After a hearing, the trial court denied Cox's motion. Cox timely appeals to this Court raising nine issues, which have been restated and rearranged to allow for the issues to be addressed in the order they were presented to the trial court.

> I.   The trial court erred in failing to change venue.
>
> II.   The trial court erred in failing to exclude certain testimony and evidence.
>
> III.   The jury selection process was tainted.
>
> IV.   The trial court erred in instructing the jury on aggravating circumstances.
>
> V.   The trial court erred in refusing certain jury instructions proposed by Cox.

7

VI.     The verdict was insufficient under Mississippi Code Sections 99-19-101 and 103 to support imposition of a sentence of death.

VII.    The death sentence is in violation of the Constitution of the United States.

VIII.   The death sentence is constitutionally and statutorily disproportionate.

IX.     Cumulative error mandates reversal.

## ANALYSIS

¶17.    The case *sub judice* is unlike many capital-murder appeals before this Court by virtue of Cox's guilty plea. Cox pleaded guilty, which ultimately placed his fate into the hands of his peers. Although we find no merit to any of Cox's claims of error, we have considered each with the heightened scrutiny accorded to all death-penalty cases:

> [C]onvictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992). Under this method of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Id.*** (quoting ***Irving v. State***, 361 So. 2d 1360, 1363 (Miss. 1978)).

***Moffett v. State***, 49 So. 3d 1073, 1079 (Miss. 2010) (quoting ***Loden v. State***, 971 So. 2d 548, 562 (Miss. 2007); ***Thorson v. State***, 895 So. 2d 85, 97 (Miss. 2004)) (citations omitted).

## I. PRETRIAL MOTIONS

¶18.    Issues I and II will be addressed together, as both concern pretrial motions. Neither party argues that the rules of evidence apply to this proceeding. Mississippi Rules of Evidence 101 and 1101(b)(3) state that the rules are inapplicable at sentencing trials. Miss. R. Evid. 101 and 1101(b)(3). The trial court acknowledged this during pretrial arguments.

However, given that Cox's sentence was to be decided by a jury, the trial court correctly held that the court would proceed under the rules. Mississippi Code Section 99-19-101 provides:

> [I]f the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury. . . . In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Mississippi.

Miss. Code Ann. § 99-19-101 (Rev. 2007).

**A. Venue**

¶19. "A motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged." *Gray v. State*, 728 So. 2d 36, 65 (Miss. 1998) (citing Miss. Code Ann. § 99-15-35). If the defendant presents two affidavits declaring that the defendant cannot receive a fair trial, then a rebuttable presumption is raised. *Gray*, 728 So. 2d at 65 (citations omitted). This Court is to consider not only the State's evidence, but " . . . the trial judge's reasoned . . . sense of the community and, particularly in a case such as [capital murder], an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community." *Id*. (quoting *Fisher v. State*, 481 So. 2d 203, 215 (Miss. 1985))."This Court has often held that the decision regarding a change of venue in a criminal proceeding is committed to the sound discretion of the trial court." *White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986) (citing *Winters v. State*, 473 So. 2d 452 (Miss. 1985), *Cabello v. State*, 471 So. 2d 332 (Miss. 1985)).

9

¶20.    Cox argues that the trial court's ruling on his motion for change of venue was error because of media coverage in Union County. Cox further argues that the media coverage was amplified, since Benny and Melody Kirk both had previously worked for law enforcement agencies.

¶21.    Cox's reliance on *Rideau v. State of Louisiana* is misplaced, as the facts of *Rideau* are markedly different from those presented in this case. *Rideau v. State of Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10L. Ed. 2d 663 (1963)*. Rideau* reveals that the trial occurred only two months after Rideau confessed in a televised interview conducted by the sheriff, which was broadcasted on three different occasions to a total of 97,000 viewers. *Rideau*, 373 U.S. at 724. Three members of the jury stated that they had seen the "interview," and two members of the jury were deputy sheriffs. *Id.* at 725. The United States Supreme Court held that the denial of the change of venue was a denial of Rideau's due process rights. The Court stated that:

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial–at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id.* at 726. *See also Irvin v. Dowd*, 366 U.S. 717, 728, 81 S. Ct. 1639, 1645, 6 L. Ed. 2d 751 (1961) (After a thorough review of the record, the Supreme Court noted that eight of the twelve jurors believed the defendant to be guilty prior to the start of the trial. "With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by

so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.").

¶22. Upon a close review of the record before us, Cox presented no evidence of "saturation media publicity" (*see Fisher*, 481 So. 2d at 215), "pervasive exposure" (*see Rideau*, 373 U.S. at 726), or "public passion" (*see Irvin*, 366 U.S. at 728). Nor, as posited by the dissent, are the elements of *White v. State*, 495 So. 2d 1346 (Miss. 1986), present. There is no evidence of "threatening crowds" or "an inordinate amount of media coverage." *Id.* at 1349. The cases relied upon by both Cox and the dissent are so factually dissimilar from the present case that it cannot be argued logically that the presumption of prejudice is irrefutable. "Mississippi law on the subject of change of venue has been primarily summarized in the cases of *Cabello v. State*, 490 So. 2d 852 (Miss.1986); *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *Fisher v. State*, 481 So. 2d 203 (Miss. 1985); *Johnson v. State*, 476 So. 2d 1195 (Miss.1985); and the cases incorporated therein." *White*, 495 So. 2d at 1348. However, those cases focus on the presence of "extraordinary and intensely prejudicial pretrial publicity." *Id.* There is no evidence of any such "extraordinary or intensely prejudicial pretrial publicity" in this case.

¶23. Cox argues that, because of the population of Union County (27,340), the lack of continuous publicity or contemporary coverage should not factor in to the trial court's discretionary decision. Cox argues that, since the crime involved hours-long hostage negotiations, the people of Union County would be more affected.

¶24. Cox presented two affidavits opining that Cox could not receive a fair trial due to "talk in the community." One of the affidavits was sworn to by Cox. Cox offered four

11

newspaper articles, dated May 15, 18, 19, and 20, 2010, which identified the family and addressed his incarceration in Pontotoc County. The jury was empaneled in September 2012, more than two years and four months[5] afer the publication of the crime articles submitted in support.

¶25. The State presented four rebuttal witnesses–a retired bank employee, a manufacturer's representative, a current county supervisor, and a former county supervisor. Each resided in Union County. Three testified that they knew who Benny Kirk and Kim Cox were. All testified to hearing of the crime at the time it occurred. None had since heard any community talk concerning the crime.

¶26. The trial court found that the articles and the testimony of the State's witnesses established that the crime had not been publicized since it occurred. The trial court stated that even he "lives in South of Lee County and Tupelo and watches Channel 9 and reads the newspaper everyday . . . and I've not seen anything on this myself personally on television or read anything in the newspaper about it except when it happened." The trial court found that the State sufficiently had met its burden.

---

[5] The dissent by Justice Kitchens posits that we rely too heavily on the fact that these articles were published two years and four months prior to the trial. However, in **Davis v. State**, the Court noted that an article was published the day before the trial, **Davis v. State**, 767 So. 2d 986, 992(Miss. 2000). In **Gray**, the Court noted that the trial was fourteen months removed from the last publication offered by Gray. **Gray**, 728 So. 2d at 65. In **Fisher**, the Court noted extensive media coverage which lasted until two months prior to trial and then resumed a week before the trial began. **Fisher**, 481 So. 2d at 219. Additionally, in **Rideau**, 97,000 people witnessed Rideau's confession two months prior to the trial. **Rideau**, 373 U.S. at 724.

¶27. This Court has stated that "when the news media have heavily reported a case, the lower courts should be prepared to change venue." *Davis*, 767 So. 2d at 994 (citing *Johnson v. State*, 476 So. 2d 1195, 1215 (Miss. 1985)). However, as in *Gray* and *Davis*, this case was not "saturated with publicity" as was the case in *Fisher* and *Johnson*.[6]

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23. The trial court did not abuse its discretion as to this issue. *See Davis*, 767 So. 2d at 993 (A judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that the trial court abused its discretion.). This issue is without merit.

### B. Admissibility of Evidence

### *1. L.K.'s Videotaped and Live Testimony*

¶28. L.K. was interviewed forensically shortly after the crime. Pretrial, an *ore tenus* hearing was conducted regarding the admissibility of L.K.'s forensic interview. Extensive arguments were exchanged concerning the video, namely L.K.'s description of the sexual abuse and statements on the video concerning Cox's prior incarceration.

---

[6] *Gray* had eleven articles; *Davis* had two articles; *Fisher* and *Johnson* each had more than sixty articles.

¶29. The trial court found portions of the video admissible pursuant to Mississippi Rule of Evidence 803(25) (the tender-years exception to the hearsay rule). The trial court also determined the video admissible to support the State's aggravator of "especially heinous, atrocious, or cruel." The State prepared a redacted version of the video in accordance with the trial court's ruling. After jury voir dire was complete and on the morning opening arguments were to begin, Cox moved the court to remove additional portions of the video, arguing they were inflammatory and prejudicial; however, Cox's motion again was denied.

¶30. At trial, the redacted version of the video was played for the jury. Cox objected to the video being admitted. The trial court then required L.K. to take the stand for cross-examination by Cox. Cox declined to confront his accuser.

¶31. Cox's objection was centered on Rules of Evidence 403 and 404(b) and the Due Process Clause. Rule 403 provides that "if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[,]" then the evidence may be excluded. Miss. R. Evid. 403. Rule 404(b) governs the exclusion of prior bad acts. Cox argued that the video was being used only to inflame the jury.

¶32. Cox now argues that certain portions of the video were particularly inflammatory and unnecessary to prove that Kim was incapacitated and unable to remove herself from Cox's criminal acts upon her daughter and was taunted by Cox while watching her daughter being sexually assaulted. Cox argues other portions of the video should have been excluded, specifically those which discussed whether the sexual penetration was vaginal or oral,

14

whether Cox ejaculated into L.K's mouth, L.K.'s reaction when Cox ejaculated into his stepdaughter's mouth, and whether her mother was forced helplessly to witness this atrocious conduct inflicted upon her daughter.

¶33.    Cox relies on *Tudor v. State*, 299 So. 2d 682 (Miss. 1974), asserting that Cox was subjected to testimony and tactics which were highly inflammatory and prejudicial. *Tudor* is wholly distinguishable and offers no help for Cox in the case *sub judice*. In *Tudor*, this Court addressed questioning regarding separate crimes for which Tudor was not charged, finding such questioning highly prejudicial. *Tudor*, 299 So. 2d at 685. *Tudor* was a different crime upon a different defendant. *Id.* The admitted portions of the video account for three of the charges in Cox's indictment and eventual guilty plea. Cox's reliance on *Tudor* is completely misplaced. *Tudor*, 299 So. 2d 682.

¶34.    The State correctly argues that under Rule 403, the trial court is not prohibited from allowing prejudicial evidence, if its probative value outweighs any unfair prejudicial effect. *See* Miss. R. Evid. 403; *Ross v. State*, 954 So. 2d 968, 993. The trial court provided Cox an opportunity to cross-examine L.K., negating any constitutional claim of deprivation of the right to confront his accuser. The trial court properly allowed the video into evidence, as the evidence established aggravators presented to the jury. *See Evans v. State*, 422 So. 2d 737, 742-43 (Miss. 1982) (Even though defendant pleaded guilty, photographs of the crime scene, defendant's confession, and testimony of the victim's brother were upheld as probative and necessary to prove the aggravating circumstances.). We discern no error as to these claims.

¶35.    Justice Kitchens's dissent posits that the trial court committed reversible error by allowing L.K. to testify, arguing it was cumulative and unnecessary due to Cox's waiver of his right to confront the witness. The dissent points out that L.K. was asked two questions; the answers were offered as proof that Kim was alive at the time all three sexual acts occurred. Such testimony was not cumulative of the forensic interview published to the jury. Second, even though Cox waived his right to confront this witness, the State is permitted to offer testimony to establish the aggravating circumstances, in this case that the crime was especially heinous, atrocious, and cruel.

### 2. Prior Incarceration

¶36.    Cox objected to the admissibility of evidence related to his prior incarceration, citing Mississippi Rule of Evidence 404(b). Evidence of prior bad acts is inadmissible when seeking to prove the character of the person by showing he acted in conformity therewith. Miss. R. Evid. 404(b). However, Rule 404(b) explicitly provides exceptions for other purposes, a nonexclusive list which includes "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id*.

¶37.    Testimony of Cox's recent incarceration was admitted to show that he had been incarcerated and to allow the circumstances surrounding the charged crime to be developed. Limited testimony about Cox's previous incarceration was admissible for numerous other purposes, including motive, intent, preparation, and plan. Cox had a motive for his charged crime. He blamed Kim and L.K. for his incarceration. Two of Cox's former cellmates testified that Cox had outbursts of anger, expressed his hatred for Kim, and said that he

16

would kill her. Benny Kirk testified that Cox had told him that he had intended to wait and kill them all, including Benny, on the following day, but that he changed his mind when he drove past Salmon's home on May 14, 2010. Benny's testimony also supports "other purpose" admissibility.

¶38. The trial court allowed only limited statements regarding Cox's prior incarceration. The trial court also instructed both parties to present the court a limiting instruction for the jury. Further, the trial court enforced a strict ruling, excluding testimony concerning the prior sexual battery of L.K. for which Cox was charged and incarcerated. No testimony was put before the jury in violation of Rule 404(b). This argument is without merit.

### 3. Crime Scene and Autopsy Photographs

¶39. Cox objected to the admission of six crime-scene photographs. One photo depicts Kim as found when law-enforcement officers entered the home. The other five photographs show entry and exit wounds of Kim's right arm, breast, and abdomen. Cox also objected to autopsy photographs depicting Kim's separate wounds. Cox argues that the photos were unnecessary, because he admitted to killing Kim and pleaded guilty; thus, there was no contradiction or denial about who killed Kim, nor was there a need to identify her.

¶40. Cox relies on *Sudduth v. State* for the premise that photographs are "not ordinarily . . . admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990) (citing *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989); *Shearer v. State*, 423 So. 2d 824, 827 (Miss. 1982)). However, the *Sudduth* Court also held that:

17

> A review of our case law reveals that the admission of photographs into evidence is within the discretion of the trial judge, and such admission will be upheld on appeal absent a showing of an abuse of that discretion. *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989); *Jackson v. State*, 527 So. 2d 654, 657 (Miss. 1988); *Alford v. State*, 508 So. 2d 1039, 1041 (Miss. 1987). If photographs are relevant, the mere fact that they are unpleasant or gruesome is no bar to their admission in evidence. *Davis*, 551 So. 2d at 173; *Boyd v. State*, 523 So. 2d 1037, 1040 (Miss. 1988).
>
> . . .
>
> Photographs of bodies may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. *Davis*, 551 So. 2d at 173; *Griffin v. State*, 504 So. 2d 186, 191 (Miss. 1987); Miss. R. Evid. 403.

*Sudduth*, 562 So. 2d at 69-70.

¶41.    In *Evans v. State*, 422 So. 2d 737, 742-43 (Miss. 1982), this Court affirmed a trial court's decision to admit similar evidence during the sentencing phase, even if the crime already had been admitted by the defendant in his guilty plea. Evans made the same argument we see today. Since Evans had pleaded guilty to the homicide, photographs of the crime scene, his confession, and testimony of the victim's brother identifying the victim's body were inflammatory. *Id*. This Court determined that the evidence was properly admitted because the evidence had probative value and was necessary to prove the aggravating circumstances that were submitted to the jury. *Id*. at 743. This Court stated, " . . . the appellant caused the situation and cannot complain, if the evidence has probative value." *Id*.

¶42.    In this case, crime-scene photographs were used to supplement the testimony of investigator Paul Moore, who was present during the course of the crime and entered the home soon after the defendant was captured. Regardless of Cox's plea of guilty, each photo

18

meets all three of the above-mentioned requirements, as they were necessary to describe the scene, to show the location of the body and the cause of death, and to aid the investigator and the coroner in their testimony. Cox offers nothing to support his argument that the photographs were gruesome or inflammatory to the jury. They merely displayed Kim's wounds and were probative to establish the "especially heinous, atrocious, and cruel" treatment of Kim. This issue has no merit.

### *4. Victim-Impact Testimony*

¶43.   Cox argues that improper victim-impact testimony was presented to the jury. Cox moved the court to suppress any victim-impact testimony; however, at the motion hearing, defense counsel explained to the trial court that the motion had been resolved, as the State had agreed that no victim-impact testimony would be introduced during the culpability phase. Once at the sentencing trial, defense counsel failed to renew any objections as to victim-impact testimony. Cox's claim is, therefore, barred from consideration. *See Carrothers v. State*, 148 So. 3d 278, 304 (Miss. 2014) (citing *McQuarter v. State*, 574 So. 2d 685, 688 (Miss. 1990)).

¶44.   Procedural bar aside, Cox unconvincingly argues that L.K.'s forensic interview, L.K.'s presence before the jury, and the testimony of Kristie Salmon (Kim's sister), Benny Kirk (Kim's father), and Melody Kirk (Kim's stepmother) is victim-impact testimony, despite each being fact witnesses to the crimes. Cox concedes that there is no *per se* bar of victim-impact testimony, as the United States Supreme Court determined that it does not automatically violate the Eighth Amendment. *Payne v. Tennessee*, 501 U.S. 808, 825, 111

19

S. Ct. 2597, 2608, 115 L. Ed. 2d 720 (1991) (". . . victim impact evidence serves entirely legitimate purposes.").

¶45.    In *Payne*, the United States Supreme Court overruled *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 400 (1987), and adopted the following:

> "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Payne*, 501 U.S. at 825, 111 S. Ct. at 2608 (quoting *Booth*, 482 U.S. at 517, 107 S. Ct. at 2540 (White, J., dissenting) (citation omitted), *overruled* by *Payne*, 501 U.S. 808, 111 S. Ct. 2597. In *Evans v. State*, this Court held that victim-impact testimony may be admissible at sentencing for "proof of the manner in which the homicide was committed, as well as, facts relevant to aggravating circumstances." *Evans*, 422 So. 2d at 742.

¶46.    As the State correctly raises, Cox does not specifically address admitted testimony that violated Cox's Eighth and Fourteenth Amendment rights, but merely argues that the witnesses' testimony as a whole was improper. Cox urges this Court to impose a different standard than that set forth in *Payne*. We decline. The testimony provided by family members focused on the scene of the crime, Salmon's escape, and Benny and Melody communicating multiple times during the crime with Cox, Kim, and the children. L.K. was a direct victim of the crime. Cox does not present this Court with either a factual or legal basis to adopt a standard inconsistent with our established precedent. Cox's arguments are unpersuasive and without merit.

## II. JURY SELECTION

¶47.   Cox's third claim of error is that the jury selection process was tainted. He argues that selected juror members had prior knowledge of the crime or were acquainted with family members. He contends that the State acted in a discriminatory manner by striking African-American venire members. Cox argues that the trial court breached the sequestration rule once the jury was empaneled. Finally, Cox argues that Kim's family made attempts to tamper with the jury.

### A. Voir Dire

¶48.   Cox also now argues that the resulting venire pool confirms that the trial court erred.[7] Cox argues that sixty percent of the twelve jurors and three alternates had prior knowledge of some aspect of the crime or were acquainted with someone involved. Cox directs our attention to venire member Number 117,[8] who revealed that she was L.K.'s youth group leader. Number 117 was later excused for cause. Cox complains about the seating of Number 30, the first-seated juror, who responded that "from time-to-time," Benny Kirk came to the furniture store where she worked.  No affinity or relationship with Kirk was developed.  Cox complains of four additional venire members who were either excused or struck for cause, by citing to transcript pages. The State replies that, of ninety-eight venire members, only one juror was empaneled who knew the Kirks. We find no merit in this claim.

_____

[7] After jury voir dire, Cox did not renew his motion for a change of venue.

[8] Numbers will be used to refer to venire members.

21

¶49.     Cox now claims lack of impartiality was established because Number 66, juror number four, was a neighbor of the district attorney. Number 66 stated that he could be fair and impartial regardless of who was his neighbor. Number 66 was not challenged by Cox.[9] Cox cites **Taylor v. State**, 656 So. 2d 104 (Miss. 1995), but his reliance is misplaced. In **Taylor**, we held that a jury member should have been dismissed for being the brother (not neighbor) of the district attorney. **Id.** at 111. Cox's present claim of lack of impartiality as to Number 66 is unsupported by the record.

¶50.     Cox submits that some venire members were dismissed for cause based on their view against the death penalty, citing **Witherspoon v. Illinois**, 391 U.S. 510, 88 S. Ct. 1170, 20 L. Ed. 2d 966 (1968), and **Adams v. Texas**, 448 U.S. 38, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980). A "juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." **Adams**, 448 U.S. at 45. We agree that venire members may be jurors even if they have remaining scruples about the death penalty, so long as the individuals agree to follow the law and consider the sentence in accordance therewith.

¶51.     Cox argues that two venire members who eventually had expressed an ability to impose the death penalty after previously being unsure were challenged for cause. The record reveals otherwise.  Both were questioned at length, and both offered inconsistent answers.

_____

[9] We note that, during the jury selection process, the State and Cox agreed on excusing a large number of potential jurors; however Cox never objected to Number 66.

22

Cox concedes that their responses were "rambling" and "confusing." We find no abuse of discretion by the trial judge.

¶52. Cox seeks to extend this argument to include venire members excused by agreement. The State submits that it and Cox's counsel agreed that a number of jurors were beyond rehabilitation and neither side had any objection to their dismissal. We note that eighteen jurors expressed that they could not impose any sentence less than death. Such an agreement between the accused's attorney and the State's attorney to excuse jurors does not create error.

## B. *Batson v. Kentucky*

¶53. Cox argues that the State's peremptory challenges were discriminatory because five African-American venire members were struck by the State. "[T]he State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

> Criminal defendants "have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Batson*, 476 U.S. at 85-86, 106 S. Ct. 1712. However: [t]he *Batson* doctrine is not concerned with racial, gender, or ethnic *balance* on petit juries, and it does not hold that a party is *entitled* to a jury composed of or including members of [a] cognizable group. Rather, it is concerned exclusively with *discriminatory intent* on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

*Strickland v. State*, 980 So. 2d 908, 914-15 (Miss. 2008) (citing *Ryals v. State*, 794 So. 2d 161, 164 (Miss. 2001)).

¶54. For *Batson* determinations, this Court has established that:

> [a] reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence."

*Tanner v. State*, 764 So. 2d 385, 393 (Miss. 2000). . . . "On appellate review, the trial court's determinations under *Batson* . . . are accorded great deference because they are based, in a large part, on credibility." *Coleman v. State*, 697 So. 2d 777, 785 (Miss. 1997). . . . The term "great deference" has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. *Lockett v. State*, 517 So. 2d [1346,] 1349 (Miss. 1987).

*Smith v. State*, 835 So. 2d 927, 940 (Miss. 2002). "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207-08, 170 L. Ed. 2d 175 (2008); s*ee also Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)) ("[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"). In *Hernandez*, the United States Supreme Court added that "in the absence of exceptional circumstances, we would defer to [the trial court]." *Hernandez*, 500 U.S. at 366, 111 S. Ct. 1859.

¶55.    *Batson* requires a defendant, in order to make out a *prima facie* case of purposeful discrimination, to establish:

(1) that he is a member of a cognizable racial group;

(2) that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race*;

(3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

***Sudduth***, 562 So. 2d at 71 (citing ***Batson***, 476 U.S. at 96, 106 S. Ct. at 1723, 90 L. Ed. 2d at 87-88) (emphasis added).

¶56.    Cox concedes that the State need not provide "either the veracity or legitimacy of [its] reasons and may rely on a wide range of reasons," citing ***Lockett v. State***, 517 So. 2d 1346 (Miss. 1987). Cox further concedes that "on their face" the State's reasons "appeared to be based on something other than the race of the juror." Contrastingly, Cox urges this Court to find the trial court to be "clearly erroneous;" to disregard "great deference;" to ignore the trial judge's "evaluation of the prosecutor's state of mind through demeanor and credibility" on the printed record before us; and to declare the State's reasons were actually pretextual. Cox submits that the State passed upon forty-two potential jurors, five of whom were African Americans, and that the State struck all five African Americans. Although the first two prongs of ***Batson*** did not apply to establish a *prima facia* case of discriminatory intent,[10] the trial court directed the State to articulate race-neutral reasons.

### 1. Tyrone Foote - Venire Member Number 46

¶57.    Peremptory challenge S-2 was to Tyrone Foote. The State offered that its strike of Foote was based on the assistant district attorney's prosecution of Foote's family members. The assistant district attorney stated, "I think I've sent more Footes to the penitentiary out of Union County than any other name, I think. His brother was sentenced on drug charges. We've had Zyrone and CoCo and all amounts of Footes that we've sent to the penitentiary. . . ." Additionally Foote failed to answer questioning during voir dire on whether any family

---

[10] The accused and the victims were Caucasian.

25

member had been prosecuted, despite responding on his jury questionnaire form that his brother had been prosecuted, confirming the validity of the State's reason. The trial court noted that Foote had family members prosecuted by the same district attorney's office. Cox argues that the reason was only facially race-neutral, as venire member Number 13 responded on his questionnaire form that his father had once been charged with a crime. The State rebuts that there is a difference between being "charged" and being prosecuted.

¶58. Cox also directs us to Number 51, whose response on the questionnaire form revealed that a "close friend" had been charged by the district attorney with a drug offense. The State rebuts that a close friend and a brother are distinguishable. Last, Cox provides that the State accepted Number 180, whose wife had been charged with shoplifting. The State also points out that both Number 51 and Number180 "strongly favored" the death penalty, whereas Foote "generally favor[ed]" the death penalty. The State also distinguishes the accepted venire members from Foote by focusing on the fact that Foote was struck because of the prosecutor's knowledge that he had prosecuted a number of Foote's family members without any indication that the same was true for the other three venire members.

### 2. Denise McLaurin - Venire Member Number 97

¶59. The State's S-5 peremptory challenge was to McLaurin. The State offered that McLaurin wrote "undecided" by the "yes" and "no" options on the jury questionnaire form regarding imposing the death penalty. The State was entitled to choose jurors it believed were best qualified. Cox argues that, because other remaining venire members were unsure on their questionnaires whether they could impose the death penalty, but later stated that they

26

could impose it and follow the law if required, the State was using that reason as an excuse for disparate treatment. The trial court accepted the State's articulated reason. The trial court stated that the State had the right to choose and he would allow the strike because of these venire members' concerns regarding the questionnaire response.

### 3. Linda Nugent - Venire Member Number 143

¶60. The State's S-9 peremptory strike was Nugent. The State offered several reasons for striking Nugent. Nugent indicated on her questionnaire form that she was "generally against" the death penalty, and the State sought to strike those who were generally against it . Counsel for the State reiterated that he believed that he consistently had struck all jurors indicating that they were generally against the death penalty. Second, Nugent's son had been convicted of burglary, and her brother was currently on the Union County criminal docket.

### 4. C. Ingram - Venire Member Number 148

¶61. Peremptory challenge S-10 was exercised in excusing Ingram based on her prior employment at the Marshall County Correctional Facility. The State noted that Ingram worked at the correctional facility and that the State previously had agreed with Cox's counsel to excuse another venire member because of employment at the Union County Correctional Facility. The State expressed its desire to excuse any venire member who had daily contact with prisoners for fear of attachment and an unwillingness to consider the death penalty. Cox argued that the trial was in Union County, not Marshall County, and that Ingram was currently unemployed; thus the State's excuse must be pretextual. The State replied that,

regardless of her current employment status, the fact she had other family members working at correctional facilities also was of concern.

¶62. Cox argues disparate treatment of venire member Number 203, on whom the State did not exercise a peremptory challenge. Number 203 was offered as an alternate juror, and the defense ultimately struck him. Number 203 previously had worked at the Marshall County Correctional Facility in Holly Springs. The State rebutted that a significant differentiating factor existed between Ingram and Number 203– their opinions on the death penalty. Ingram had "no opinion." Number 203 "strongly favor[ed]" the death penalty.

### 5. David Joiner - Venire Member Number 153

¶63. The State's S-11 peremptory challenge was to Joiner. The State provided that Joiner had  indicated on his questionnaire that he *could never* consider the death penalty. The questionnaire was marked and entered as an exhibit, and the trial court accepted the State's argument, stating that it was a race-neutral reason. We discern no error.

¶64. The party objecting to the peremptory challenge must: (1) "make a prima facie showing that race was the criteria for the exercise of the peremptory challenge[;]" then, (2) "if this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror[;]" and (3) "[t]he trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges." *Strickland*, 980 So. 2d at 915.  Here, the trial court fully considered each challenge offered by the defense and each reason offered by the State and concluded that there was no

28

discriminatory intent or purposeful discrimination. "[T]here is a presumption that the judgment of the trial court is correct and the burden is on the Appellant to demonstrate some reversible error to this Court." **Birkhead v. State**, 57 So. 3d 1223, 1231 (Miss. 2011) (citing **Juarez v. State**, 965 So. 2d 1061, 1061 (Miss. 2007)).

> This finding, the byproduct of the eyewitness impressions recorded by the trial judge in fulfilling his pivotal role in evaluating **Batson** claims, is entitled to "great deference." In other cases, perhaps a cold appellate record could reveal facts from which an appellate court could safely declare error. But such is not the case here.

**Booker v. State**, 5 So. 3d 356, 361 (Miss. 2008) (internal citation omitted).

¶65. The trial court determined that Cox had failed to meet his burden of proving discriminatory intent or purposeful discrimination. We find no abuse of discretion in the trial court's ruling.

### C. Sequestration

¶66. Cox argues that the trial court breached sequestration by allowing the newly empaneled jurors to go home and pack their bags, giving them one-and-a-half hours away from the court. Cox argues that the Court should have instructed the entire remaining venire to bring packed bags, citing **Watts v. State**, 733 So. 2d 214, 244 (Miss. 1999). Cox further provides that, even though the trial court instructed the jurors on sequestration, it did not remedy the problem of interference by outside sources, citing **Simmons v. State**, 805 So. 2d 452, 506 (Miss. 2001).

¶67. In **Watts**, this Court concluded that, because both the State and the defendant consented to the jurors being allowed to leave and pack their bags, a new trial was not

29

warranted. *Watts*, 733 So. 2d at 244. Cox's argument that the trial court failed to obtain the defendant's consent is unavailing. The record reveals that, after the trial court announced it was allowing the jurors to leave to pack their bags, the trial court asked if the State or the defense had anything to say regarding his announcement. Both responded that they did not.

¶68. We find no violation of the sequestration rule in this case for allowing jurors to pack their bags. No arguments had commenced and no evidence had been admitted. Neither the State nor Cox objected. Cox offers no evidence or support that a single juror disobeyed the court's instruction. *See Simmons*, 805 So. 2d at 506 (argument "lacks merit without proof that one of more of the jurors disobeyed the judge's instructions"). This issue is without merit.

### D. Other

¶69. Cox next belatedly argues that Kim's family was on a "crusade" to influence the jury. While this issue does not fall under jury selection, Cox included this argument in the jury-selection section of his brief. In his brief, Cox states that "[o]n the morning the case was argued and submitted the courtroom was surrounded with uniformed members of that 'family of law enforcement,' standing along the wall and in front of the jury, and to which the prosecution made explicit reference." The record reflects no objection or complaint was raised contemporaneously. This assertion was first raised at his hearing for a new trial. "[T]his Court repeatedly has held that failure to object contemporaneously at trial waives any claim of error on appeal." *Gillett v. State*, 56 So. 3d 469, 520 (Miss. 2010) (citing *Howell v. State*, 860 So. 2d 704, 756 (Miss. 2003)); *Walker v. State*, 671 So. 2d 581, 597 (Miss.

30

1995) ("This Court has repeatedly held that '[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case.'"). This claim is procedurally barred.

¶70.    Procedural bar notwithstanding, Cox now argues their presence presented a coercive atmosphere of intimidation. Cox cites **Balfour v. State**, which noted that " . . . in capital murder cases *where the victim was a member of law enforcement*, the *potential exists* for a coercive atmosphere when uniformed law officers sit together in a group." **Balfour v. State**, 598 So. 2d 731, 756 (Miss. 1992). This Court went on to instruct that the potential for influence can be lessened if officers wear street clothes or " . . . when uniformed personnel are dispersed in the courtroom." **Id**.

¶71.    However, the victims to these crimes were a housewife and children, not "member[s] of law enforcement." **Id**. Cox wants to extend **Balfour** to when a victim(s) is "otherwise connected to law enforcement." **Balfour** does not apply to victims who are relatives of law-enforcement personnel. **Balfour**, 598 So. 2d at 756. We decline to extend the **Balfour** holding.

### III. JURY INSTRUCTIONS[11]

#### A. Granted

¶72.    The jury was instructed on seven aggravating factors pursuant to Mississippi Code Section 99-19-101(5): (1) that the defendant knowingly created a great risk of death to many persons; (2-6) that the defendant was in the process of committing another felony, *i.e.*, the

---

[11] Issues IV and V claim trial-court error in granting certain jury instructions and in denying others.

31

kidnapping of Kim, L.K., and D.C., the sexual battery of L.K., and burglary; and (7) that the "capital offense was especially heinous, atrocious, or cruel." Miss. Code Ann. § 99-19-101(5) (Rev. 2007).

¶73.    First, Cox, citing *Ladner v. State*, 584 So. 2d 743, 763 (Miss. 1991), claims error in allowing the aggravator of "creating a great danger to many people" because it is "totally subsumed" by the evidence proving the "in the commission of a felony" aggravator. However, in *Ladner*, this Court was faced with a robbery in the commission of the capital murder and held that "where the indictment charges a robbery/capital murder offense and robbery is designated as an aggravating circumstance, pecuniary gain should not be used as an aggravating circumstance unless clearly supported by the evidence." *Ladner*, 584 So. 2d at 763. Not only is *Ladner* specifically instructing on cases involving robbery/capital murder, but *Ladner* also holds that the aggravating circumstances of robbery and pecuniary gain still may be used if "clearly supported by the evidence." *Id*. *Ladner* does not apply.

¶74.    Cox further argues that the trial court erred by allowing the "stacking" of aggravators, citing *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001). In *Goodin*, this court approved "stacking" aggravators if the charge arises from separate and distinct acts, thus permitting kidapping and robbery as two separate aggravators of the capital murder. *Goodin*, 787 So. 2d at 654. This Court has upheld *Goodin*'s analysis in numerous recent cases. *See Keller v. State*, 138 So. 3d 817, 873 (Miss. 2014); *Gillett v. State*, 56 So. 3d 469, 510 (Miss. 2010); *Loden v. State*, 971 So. 2d 548, 569 (Miss. 2007); *Le v. State*, 967 So. 2d 627, 636 (Miss. 2007); *Bennett v. State*, 933 So. 2d 930, 954 (Miss. 2006).

¶75.    Cox argues due process should require limitations on stacking. We find that Cox's due-process rights were not violated by the aggravators presented to the jury, as four of those aggravators were for crimes committed in conjunction with the murder of Kim. The trial court properly relied on *Goodin v. State*. We affirm his decision.

¶76.    Cox asks this Court to overrule *Thorson v. State*, 895 So. 2d 85 (Miss. 2004), and *Ross v. State*, 954 So. 2d 968 (Miss. 2007), and hold that it is plain error to use the same conduct that capitalizes a homicide as an aggravator for imposing a death sentence. We decline.

### B. Denied

### *1. Instruction D-7*

¶77.    Jury instruction D-7 reads:

> If you cannot, within a reasonable time, agree as to punishment, I will dismiss you and impose a sentence of imprisonment for life without the benefit of parole. If you cannot agree, know that any of you may inform the bailiff of this.

The State draws this Court's attention to *Gillett v. State*, 56 So. 3d 469, 515 (Miss. 2010); *Pitchford v. State*, 45 So. 3d 216, 255 (Miss. 2010); *Edwards v. State*, 737 So. 2d 275 (Miss. 1999); and *Stringer v. State*, 500 So. 2d 928, 945 (Miss. 1986), all upholding the rejection of the same instruction. In *Gillett*, this Court held that the trial court would not be held in error for failing to give the instruction when the jury was provided with the three statutory sentencing options. *Gillett*, 56 So. 3d at 516. Here, the jurors were provided all three options.

33

¶78. Cox concedes that this Court has refused the same instructions but argues that this case is distinguishable because of the cumulative effects of the jury-instruction errors. We disagree and find no error.

### *2. Instructions D-12, D-13, D-15, D-17, and D-18*

¶79. Cox asserts that the denial of each of these instructions deprived the jury of sufficient instruction on their individual right and duty to decide Cox's sentence and on the broad scope of their individual right to decide against a death sentence. Cox argues that, because the instruction given to the jury was merely a list of mitigating circumstances, the jury was not instructed on how each juror should assess the evidence in making an "individualized reasoned moral judgment." Cox does not argue each instruction separately, offering instead a general argument.

¶80. Specifically, the trial court refused instruction D-12 per *Watts v. State*, 733 So. 2d 214 (Miss. 1999). Instruction D-13 was refused as a mercy instruction. Instruction D-15 was refused per *Simmons v. State*, 805 So. 2d 452 (Miss. 2001), and Mississippi Code Section 99-19-101. Instruction D-17 was dismissed as none of the parties could clearly interpret its meaning, and the trial court found that its content was covered by another instruction. Instruction D-18 also was refused as a mercy instruction pursuant to *Goodin v. State*, 787 So. 2d 639 (Miss. 2001).

¶81. The trial court gave an instruction listing seven mitigators and instructed the jurors that they were not bound by only those seven, for "you may find any fact or combination of facts to be mitigating." The instruction further explained that if "you individually" find that

34

one or more of the mitigators exist, then "you" must consider whether those mitigators outweigh the aggravators. And, if "you" find that the mitigating circumstances outweigh the aggravating circumstances, then "you shall not impose" death. The aggravators were listed in the same fashion. Both were part of one instruction. We find no error in the trial court's decision to refuse instructions D-12, 13, 15, 17, and 18, as the jurors were properly instructed by the instructions given.

### 3. Instruction D-5

¶82.    The proposed instruction read, "you may impose a sentence of life imprisonment for any reason or for no reason at all." Cox argues that the jurors were not instructed that they could choose to sentence him to life imprisonment, regardless of aggravation and mitigation. However, the State correctly notes that this Court recently labeled the identical instruction as a mercy instruction and refused to find error in its refusal. *Carrothers v. State*, 148 So. 3d 278, 318 (Miss. 2014). Accordingly, this issue is without merit.

### 4. Instruction D-14 and D-19

¶83.    Cox argues that the trial court erred in instructing the jury to impose a sentence of death if the mitigating circumstances did not outweigh the aggravating circumstances. Cox argues the jury should have been instructed that a death sentence may be imposed only if the aggravation outweighs the mitigation. *Carrothers* addressed the same issue. *Carrothers*, 148 So. 3d at 319. *Carrothers* held that there is "no error in a jury instruction stating that death could be imposed if mitigation did not outweigh aggravation." *Id*. (citations omitted).  The trial court did not err in refusing the instructions. Cox concedes that this Court has rejected

Cox's argument previously. No further analysis is required, and we find this issue to be without merit.

## VI. THE VERDICT

¶84.    Cox's sixth issue claims that the jury's verdict was insufficient under Sections 99-19-101 and 99-19-103 of the Mississippi Code. Mississippi Code Section 99-19-101(3) instructs:

> (3)    For the jury to impose a sentence of death, it must unanimously find in writing the following:
>
>> (a)    That sufficient factors exist as enumerated in subsection (7) of this section:
>>
>> (b)    That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
>>
>> (c)    That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.
>
> In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) of this section and upon the records of the trial and the sentencing proceedings.

Miss. Code Ann. § 99-19-101(3) (Rev. 2007). Section 99-19-103 reads in pertinent part that ". . . [t]he jury, if its verdict be a unanimous recommendation of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt." Miss. Code Ann. § 99-19-103 (Rev. 2007).

36

¶85.	Cox argues these statutes should be interpreted to mean that the jury must make "explicit written and unanimous findings beyond a reasonable doubt." Cox argues that the jury's written findings in this case were insufficient to impose a sentence of death. The jury specifically listed the facts it found beyond reasonable doubt to have existed at the time of the commission of the capital murder. For mitigating circumstances, the jury wrote "number 1-7 of Sec. B were unanimously agreed to exist beyond a reasonable doubt." Items 1-7 of Sec. B were typed on the previous page of the instruction.

¶86.	Cox failed to object to the jury's findings. *See **Jordan v. State***, 786 So. 2d 987, 1003 (Miss. 2001) (Issues concerning the form of the verdict are procedurally barred if no objection was made when the verdict was returned.). Procedural bar aside, ***Jordan*** presents an analogous case in which the jury found the elements of an aggravator beyond a reasonable doubt. However, the jury did not specifically "say that it had found beyond a reasonable doubt that the State had proved the theory contained in the instruction. . . ." ***Id***. This Court held that, even though the jury's verdict was not ideal, as it did not reword the aggravator into a "responsive and affirmative statement," the entire verdict as a whole clearly supported the jury's verdict. ***Id***. "A fair reading of the verdict convinces us that the jury's decision is unambiguous and Jordan's claim is without merit." ***Id***. In today's case, a fair reading of the record before us and the announced verdict of the jury "convinces us that the jury's decision is unambiguous and [Cox's] claim is without merit." ***Id.***

¶87.	The jury was presented evidence on all seven aggravating factors: (1) whether the defendant knowingly created a great risk of death to many persons; (2-4) whether the captial

37

offense was committed while Cox was in the act of kidnapping Kim, L.K., and D.C.; (5) whether the murder was committed while Cox was in the commission of a burglary; (6) whether the murder was committed during the commission of sexual battery against L.K.; and (7) whether the murder was especially heinous, atrocious, or cruel. In Cox's guilty plea, he admitted facts satisfying each. The State presented evidence of each through the evidence presented to the jury. Cox does not argue that the jury lacked evidence to support each and every aggravator.

¶88.    The facts of this crime spree amply support the determination of the jury, which after weighing the aggravators and mitigators, decided that the penalty of death is not too great. *See Nixon v. State*, 533 So. 2d 1078, 1102 (Miss. 1987), overruled on other grounds by Wharton v. State, 734 So. 2d 985 (Miss. 1998). There exists no doubt that the jury's verdict was sufficient to impose the death penalty. This issue is without merit.

## V. CONSTITUTIONALITY OF THE DEATH PENALTY

¶89.    Cox begins his argument under this issue as follows, "[a]lthough Cox respectfully acknowledges that neither this Court nor the United States Supreme Court have, heretofore, adopted the positions he takes here, these positions are legally meritorious and warrant a revisiting and abandoning of any precedent inconsistent with them." We decline to revisit or abandon the established law.

¶90.    Cox submits that his sentence was unconstitutional because two of the seven aggravators on which the jury was instructed were not included in the indictment, *i.e.*, that the defendant created a great risk of death to many persons pursuant to Mississippi Code

38

Section 99-19-101(5)(c), and that the murder was especially atrocious, heinous, or cruel pursuant to Mississippi Code Section 99-19-101(5)(h). Miss. Code Ann. §§ 99-19-101(5)(c), 99-19-101(5)(h) (Rev. 2007). Cox relies on *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S. Ct. 2348, 2355, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 2443, 153 L. Ed. 2d 556 (2002). Cox also argues that *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), renders both *Apprendi* and *Ring* applicable. However, this Court, in *Batiste v. State*, 121 So. 3d 808, 871 (¶ 175) (Miss. 2013), recently held otherwise.

> In *Berry*, we determined that *Apprendi* and *Ring* do not invalidate Mississippi's capital-murder sentencing scheme. *Berry v. State*, 882 So. 2d 157, 172 (Miss. 2004). *Apprendi*'s statement that any fact that increases the maximum penalty must be charged in an indictment relates to the Sixth Amendment right to a jury trial, not to requirements for an indictment. *Havard v. State*, 928 So. 2d 771, 801 (Miss. 2006). Neither *Apprendi* nor *Ring* addressed state indictments. *See Berry v. State*, 882 So. 2d at 170. We have held that "these cases . . . address issues wholly distinct from our law, and do not address indictments at all." *Brown v. State*, 890 So. 2d 901, 918 (Miss. 2004) (citing *Stevens v. State*, 867 So. 2d 219 (Miss. 2003)). Batiste argues that *Apprendi* and *Ring* should apply to Mississippi's capital-sentencing scheme after *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Because Kansas did not address the requirements for indictments, it does not alter our analysis of this issue. Accordingly, this issue is without merit.

*Batiste*, 121 So. 3d at 871 (¶ 175). *See also Goff v. State*, 14 So. 3d 625, 665 (Miss. 2009); *Brawner v. State*, 947 So. 2d 254, 265 (Miss. 2006); *Havard v. State*, 928 So. 2d 771, 801 (Miss. 2006); *Brown v. State*, 890 So. 2d 901, 918 (Miss. 2004); *Berry v. State*, 882 So. 2d 157, 172 (Miss. 2004). In accordance with this Court's precedent, Cox's issue is without merit.

39

¶91.    Next, Cox argues that the statute under which Cox was sentenced is unconstitutional pursuant to *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), requiring that, "to be sentenced to death, a person convicted of capital murder actually must have killed, attempted to kill, intended to kill, or intended that lethal force be used in a felony." *Batiste*, 121 So. 3d at 871-72. Cox again concedes that this Court has declined to accept this argument. *See Batiste*, 121 So. 3d at 871-72; *Carrothers*, 148 So. 3d 278; *Knox v. State*, 901 So. 2d 1257, 1268 (Miss. 2005); *Stevens v. State*, 867 So. 2d 219, 223 (Miss. 2003). This issue is without merit.

¶92.    As identically raised in *Batiste*, Cox argues that Mississippi Code Section 99-19-105(3)(c) is unconstitutional on its face because it fails to provide for adequate or meaningful appellate review in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the Mississippi Constitution. *See Batiste*, 121 So. 3d at 872. Further, Cox argues, as in *Batiste*, that "the statute allows the arbitrary and capricious imposition of the death penalty because it does not provide for consideration of cases where the death penalty was not imposed." *Id*.

¶93.    *Batiste* stated:

> This argument was considered and rejected in *Lester v. State*, 692 So. 2d 755, 802-03 (Miss. 1997) (overruled on other grounds by *Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999)). Like *Batiste*, Lester argued that all cases where the death penalty was not imposed should be considered. *Id*. We found that "the current guidelines are sufficiently specific, and we find no reason to undertake the overwhelming task of considering all death-eligible cases in our review." *Id*. We adhere to our decision in *Lester* and find this issue entitles Batiste to no relief.

40

*Id*. Likewise, Cox has failed to present this Court with any basis–legal, factual, or otherwise–to warrant a decision in conflict with this Court's precedent. Thus, this argument fails.

¶94.    Last, Cox challenges the method by which he is sentenced to be executed, lethal injection, under the Eighth Amendment, alleging cruel and unusual punishment, citing *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008).

¶95.    This Court has rejected Cox's argument in, 121 So. 3d at 872; *Pitchford v. State*, 45 So. 3d 216, 256-57 (Miss. 2010); *Carrothers*, 148 So. 3d at 320-21; *Goff*, 14 So. 3d at 665; *Chamberlin v. State*, 55 So. 3d 1046, 1056 (Miss. 2010); *Bennett v. State*, 990 So. 2d 155, 161 (Miss. 2008); and *Jordan v. State*, 918 So. 2d 636, 661 (Miss. 2005).

¶96.    In *Bennett v. State*, we stated:

> If differences exist between Mississippi's execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi's lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop's Eighth-Amendment challenge to Mississippi's lethal-injection procedures, recently announced that "Mississippi's lethal injection protocol appears to be substantially similar to Kentucky's protocol that was examined in *Baze*." We agree with the Fifth Circuit's analysis, and hold that Bennett's Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.

*Batiste*, 121 So. 3d at 872 (quoting *Bennett v. State*, 990 So. 2d 155, 161 (Miss. 2008)) (citations omitted). Therefore, this issue is without merit.

## VI. DISPROPORTIONATE SENTENCE

¶97. Cox concedes that he does not meet the *M'Naghten* standard to render him legally insane pursuant to *Nolan v. State*, 61 So. 3d 887, 895 (Miss. 2011).[12] Cox's expert and a mitigation witness, psychiatrist Dr. Mark Webb, testified that he first deemed Cox incompetent to stand trial in July 2010, only a few months after the crime. However, in September 2011, Webb testified to improvements in Cox's behavior and opined Cox was competent to stand trial. Cox stipulated to his competency in December 12, 2011.

¶98. Cox concedes that "this Court must conclude 'after a review of the cases coming before this Court, and comparing them to the present case, [that] the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other,'" citing *Nixon*, 533 So. 2d at 1102. Cox argues his death sentence was constitutionally disproportionate because his witnesses opined that he suffered from mental illness and "organic brain damage"[13] from extended years of drug use and that it should be set aside under his Eighth Amendment protections addressed in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (holding that mentally retarded defendants shall not be sentenced to the death penalty), and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (holding that juveniles who are under the age of eighteen at the time

---

[12] "Under the *M'Naghten* test or rule, an accused is not criminally responsible if, at the time of committing the act, he was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it that he did not know he was doing what was wrong." *M'Naghten's Case*, 8 Eng. Rep. 718 (1843).

[13] Cox's brief refers to the condition as "organic brain damage," however, the record reveals extensive expert testimony regarding "organic brain syndrome." From Cox's brief and the record before us, it appears that Cox is referring to organic brain syndrome ("OBS").

of the crime shall not be sentenced to the death penalty). Cox argues that the holdings of *Atkins* and *Roper* should be extended to the case *sub judice*.

¶99.  The State, however, points out a key distinctive factor– juvenile and mentally retarded defendants are classified based on factors that are out of the individual's control, *i.e.*, the defendant's age or intellectual disability.

¶100.  In today's case, conflicting testimony was presented to the jury: (1) whether Cox suffered from a mental illness, (2) whether his condition resulted from nearly twenty-five years of admitted drug use, including crystal methamphetamine ("crystal meth"), *inter alia*, (3) whether Cox was on crystal meth at the time of the crime, and (4) whether he suffers from a mental illness or is a malingerer, feigning mental illness.

¶101.  Cox presented expert witnesses opining on his mental condition at the time of the crime and the consequences of prolonged drug abuse. Cox offered testimony from John Owen, a drug and alcohol counselor, who was tendered as an expert in alcohol, drug, and chemical dependency. Owen testified that, when he met with Cox, Cox told him that he had huffed gasoline fumes from the age of fifteen to twenty-five, had abused pain killers for at least five years, and had been using crystal meth for ten years. Owens testified that Cox *could have* suffered diminished brain development from huffing gasoline fumes. Owen opined that, based on meeting with Cox and hearing the in-court testimony of Cox's sister-in-law and brother regarding Cox's erratic behavior, Cox was under the influence of crystal meth at the time of the crime, which *could have* resulted in Cox experiencing a "black out" during the commission of the crime. Owen was questioned on direct examination extensively

concerning OBS and its symptoms, including cognitive difficulties, difficulty reasoning, speech impairment, and memory loss. Owen compared OBS to chronic alcoholism. However, Owen admitted that Cox did not suffer any difficulties such as memory loss or speech difficulties, except for Cox telling him that he did not remember committing the crime. Owen opined that Cox was a drug addict who suffered regressed reasoning from prolonged drug abuse or OBS.

¶102. Cox also presented Dr. Mark Webb, who was tendered as an expert in psychiatry. Webb testified that he met Cox in July 2010 and again in September 2011. He diagnosed Cox as a manic depressive with bipolar disorder. Dr. Webb opined that he saw improvements in Cox. By September 2011, he concluded that Cox was competent to stand trial. Dr. Webb stated that he made his diagnosis based on reviewing Cox's records, meeting with Cox, and Cox telling him that he had not taken drugs for one year prior to the crime.[14] Dr. Webb opined that Cox's behavior was consistent with either his diagnosis or crystal meth abuse, as persons with disorders and crystal meth users exhibit similar traits. Dr. Webb stated that he regarded as true Cox's statement that he had not taken drugs for a year prior to the crime. Thus, he maintained his diagnosis that Cox suffered from manic depression and bipolar disorder. Dr. Webb disagreed with an OBS diagnosis and testified that OBS had been removed from the diagnostic manual for being "too imprecise."

¶103. In rebuttal, the State called Dr. Reb McMichael. He was tendered as an expert in forensic psychiatry. Dr. McMichael was employed at Mississippi's state hospital at

---

[14] This statement is totally inconsistent with Owen's testimony. (*See Supra* ¶ 101).

Whitfield. Dr. McMichael testified that Cox was admitted for inpatient observation, per court order, for two weeks. Dr. McMichael testified "Mr. Cox was, in my opinion, malingering, which is faking or exaggerating real symptoms that he may have had; and because of that, we decided to admit him for a period of inpatient observation." Dr. McMichael stated that, after observation, he reached the conclusion that Cox was malingering. Cox refused multiple malingering tests, however, he agreed to take one test, receiving a score of twelve. Dr. McMichael explained that the cutoff to indicate that malingering existed was a score of six. Cox's score was double the score necessary to indicate malingering. Dr. McMichael stated that, after he and the hospital staff observed Cox, he and the staff concluded that Cox was faking memory loss and using "baby talk." Both Owens and Dr. Webb testified that Cox never spoke in "baby talk."

¶104. The staff at Whitfield observed that Cox's behavior was normal when he was unaware that he was under observation, but that his behavior would change once he was aware that he was being observed, for example, he would begin to "rock back and forth." Dr. McMichael further testified that the medications Cox told the hospital he was taking while in jail were not consistent with objective blood tests. Although Cox claimed that he did not know key facts such as the season of the year or his birthday, when he was told he would undergo a CT scan he questioned "was that going to be NPO?" His testimony established that "NPO" is the Latin phrase used in medicine for "nothing by mouth." Dr. McMichael also testified that Cox reported to him that he could not read. Contrastingly, Cox's family revealed that he could read and that he wrote letters to his family while incarcerated.

¶105. Lastly, Dr. McMichael testified that Cox showed no symptoms or signs consistent with someone who was hallucinating, although Cox claimed that he was being taunted by demons. Dr. McMichael testified that Cox's CT scans were normal, countering the testimony that Cox could have been suffering from brain damage. Dr. McMichael stated that Cox was released from Whitfield because the staff "did not see any objective evidence that Mr. Cox was mentally ill."

¶106. It was for a jury to sort out the contested facts and conflicting evidence. Experts disputed that Cox admitted to taking crystal meth regularly for years prior to this crime. Neither *Atkins* nor *Roper* is applicable to today's unprecedented arguments and they provide no basis for relief. *Atkins*, 536 U.S. 304, 122 S. Ct. 2242; *Roper*, 543 U.S. 551, 125 S. Ct. 1183.

¶107. Last, Cox argues that Mississippi Code Section 99-19-101 (6)(f), permitting the jury to consider mental illness and diminished capacity as a mitigating factor, is insufficient for capital sentencing. Miss. Code Ann. § 99-19-101 (6)(f) (Rev. 2007) (the jury may consider as a mitigating factor, "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Cox's argument is without merit, as Cox presented mitigation testimony regarding mental illness and diminished capacity, and it is obvious that the jury was not "buying in," perhaps due to the conflicting testimony of his own experts and his family disputing his ability to read and write. This issue is without merit.

## VII. CUMULATIVE ERROR

¶108.  Cox argues that the cumulative errors "incorporated into this assignment of error by reference" require reversal, citing *Walker v. State*, 913 So. 2d 198, 216 (Miss. 2005); *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990). The State submits that "[w]here there is no reversible error in any part, . . . there is no reversible error to the whole." *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996) (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987)). Because we find no merit in the errors presented, this issue is likewise without merit.

## CONCLUSION

¶109.  In accordance with this opinion, Cox's sentence is hereby affirmed.

¶110. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF BURGLARY OF A DWELLING AND SENTENCE OF TWENTY-FIVE (25) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF FIRING INTO A DWELLING AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VI: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VII: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VIII: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNTS II, III, IV, V, VI, VII, AND VIII SHALL RUN CONSECUTIVELY TO ONE ANOTHER.**

**WALLER, C.J., LAMAR, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.  DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS, J.**

**KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶111. Mississippi's capital-murder-sentencing statute includes four categories of persons who may be sentenced to death for capital murder: persons who (1) actually killed, (2) attempted to kill, (3) intended that a killing take place, or (4) contemplated that lethal force would be employed.[15] In ***Tison v. Arizona***, the United States Supreme Court approved the first three categories.[16] But, because the fourth category is hopelessly at odds with the United States Supreme Court's minimum requirements for the death penalty, I respectfully disagree with part of the majority's reasoning. However, in this case, the jury did not apply that statutory factor to sentence Cox to death, so I concur in the result reached by the majority.

¶112. In ***Tison v. Arizona***, the United States Supreme Court limited those who may be sentenced to death for capital murder to persons who "actually killed, attempted to kill, or intended to kill"[17] And in addressing and clarifying its prior decision in ***Enmund v. Florida***, the Court held that death may be imposed based on "major participation in the felony committed, combined with reckless indifference to human life,"[18] but the Court repudiated the Arizona Supreme Court's reasoning, which found that the intent discussed in ***Enmund***

---

[15] Miss. Code Ann. § 99-19-101(7) (Supp. 2014).

[16] ***Tison v. Arizona***, 481 U.S. at 149-50, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987) (citing ***Enmund v. Florida***, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982)).

[17] ***Tison v. Arizona***, 481 U.S. at 149-50, (citing ***Enmund v. Florida***, 458 U.S. 782.

[18] ***Tison***, 481 U.S. at 158.

48

included "situation[s] in which the defendant intended, *contemplated*, or anticipated *that lethal force would* or might *be used* or that life would or might be taken in accomplishing the underlying felony."[19]

¶113. Our current capital-murder statute has not been amended to meet the ***Tison*** Court's requirements. Our statute's language that allows a death sentence for those who "contemplated that lethal force would be employed,"[20] mirrors language that the United States Supreme Court repudiated in ***Tison***.[21]

¶114. So I cannot agree with prior decisions of this Court which have found this statutory factor constitutional. In my view, a jury cannot constitutionally impose a death sentence when it merely finds that the defendant "contemplated" the use of lethal force. But in the case before us today, the jury found that Cox actually killed, so this constitutional infirmity could not have affected his sentence, and I agree with the majority that his sentence should be affirmed.

¶115. I must also note that, while I do not agree that the trial judge committed reversible error by admitting the forensic interview, I do believe he committed error, and Justice Kitchens's concern is not without basis in the record. In a pretrial argument, the prosecutor's primary reason for offering the videos of the forensic interviews was "due to their tender years and the harm to them that their out-of-court statements should be admitted into

---

[19] ***Id.*** at 150 (quoting ***State v. Tison***, 142 Ariz. 454, 456 (1984)) (emphasis added).

[20] Miss. Code Ann. § 99-19-101(7).

[21] ***Tison***, 481 U.S. at 150 (quoting ***Tison***, 142 Ariz. at 456)).

49

evidence with the defendant having the right to cross-examine these children." In other words, "judge, we don't want to traumatize the children by calling them to the stand, so we should be allowed to use the videos of the forensic interviews, and they can cross-examine if they want to."

¶116. I believe it is clear that this argument persuaded the trial judge to allow the video to be played to the jury. Then, after the video was played, the prosecutor surprised everyone by calling L.K. anyway, prompting an objection by defense counsel, who had waived any cross-examination. So it is disturbing—and I believe erroneous—that the trial judge allowed both the video interview and the live testimony of L.K., particularly when the prosecutor's primary argument for use of the video was to keep L.K. from having to testify. But I cannot conclude that the error influenced the jury's verdict, so I conclude it was harmless.

**KITCHENS, J., JOINS THIS OPINION IN PART**.

**KITCHENS, JUSTICE, DISSENTING:**

¶117. I write separately to express two concerns about this case. First, the trial court committed reversible error by failing to grant a change of venue in this notorious case, which involved a law enforcement family in a small, rural Mississippi community. Second, the testimony of L.K., a minor, was cumulative of a forensic interview video which the State had published to the jury. I respectfully dissent and would reverse and remand this case for a new trial.

I.      Standard of Review

50

¶118. "[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Pruett v. State*, 574 So. 2d 1342, 1345 (Miss. 1990) (quoting *Jackson v. State*, 337 So. 2d 1224, 1252 (Miss. 1976)). Because "death undeniably is different," we recognize that "procedural niceties give way to the search for substantial justice." *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991). "What may be harmless error in a case with less at stake [may become] reversible error when the penalty is death." *Flowers v. State*, 158 So. 3d 1009, 1026 (Miss. 2014) (quoting *Fulgham v. State*, 46 So. 3d 315, 322 (Miss. 2010)). Under our heightened standard of review in death penalty cases, "*all doubts are to be resolved in favor of the accused.*" *Chamberlin v. State*, 989 So. 2d 320, 330 (Miss. 2008) (citing *Lynch v. State*, 951 So. 2d 549, 555 (Miss. 2007)) (emphasis added).

## II.     Change of Venue

¶119. The majority finds that the trial court did not abuse its discretion in denying Cox's motion for change of venue. It is true that rulings on change of venue are reviewed on appeal under an abuse-of-discretion standard: "[t]he decision to grant a change of venue rests soundly in the discretion of the trial judge." *King v. State*, 960 So. 2d 413, 429 (Miss. 2007) (citing *Howell v. State*, 860 So. 2d 704, 718 (Miss. 2003)). But that standard does not relieve this Court of its duty to review this and all other aspects of death penalty cases under heightened scrutiny. *Chamberlin*, 989 So. 2d at 330.

¶120. This Court has held that a "motion for a change of venue is not automatically granted in a capital case," but that "[t]here must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged." *King*, 960 So.

2d at 429 (citing ***Byrom v. State***, 927 So. 2d 709, 715 (Miss. 2006)). Such "satisfactory showing" requires that a motion for change of venue "be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public." ***King***, 960 So. 2d at 429 (quoting ***Davis v. State***, 767 So. 2d 986, 993 (Miss. 2000)). These cases and others are based in large part upon the requirements of Mississippi Code Section 99-15-35, which predicates a grant of a motion for change of venue on presentation to the trial judge of a written motion supported by affidavits of two or more people:

> On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

Miss. Code Ann. § 99-15-35 (Rev. 2007).

¶121. Our Uniform Rules of Circuit and County Court Practice contain no requirement that the motion for change of venue be in writing, nor do they contain a requirement that the motion be supported by two affidavits: "A change of venue may be granted, in the discretion of the judge, upon a showing of good cause." URCCC 6.06.[22] We have held in the past that the doctrine of separation of powers is violated where the Legislature creates rules of procedure for the courts of this State. *See **Newell v. State***, 308 So. 2d 71, 78 (Miss. 1975)

---

[22]This rule was adopted effective May 1, 1995.

("We believe no citation of authority is needed for the universally accepted principle that if there be a clash between the edicts of the constitution and the legislative enactment, the latter must yield."); *Jones v. City of Ridgeland*, 48 So. 3d 530, 541 (Miss. 2010) (statute held to be unconstitutional "because it usurps this Court's constitutional rule-making power and violates the doctrine of separation of powers."). To the extent the requirements of Section 99-15-35 exceed the "showing of good cause" requirement in Rule 6.06, the statute "usurps this Court's constitutional rule-making power and violates the doctrine of separation of powers." *Jones*, 48 So. 3d at 541.

¶122. A denial of a change of venue in a notorious death penalty case requires our scrupulous consideration of the fundamental right of the defendant to a fair trial, free of the bias and partiality attending publicity: "[a] fair trial is, after all, the reason we have our system of justice; it is a paramount distinction between free and totalitarian societies." *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985). Obtaining a change of venue requires that an accused waive the "right to have a trial in the county where the crime occurred." *State v. Caldwell*, 492 So. 2d 575, 577 (Miss. 1986). This Court has held that:

> It is a great mistake to suppose that because an atrocious crime has been committed, for which one ought certainly to be convicted anywhere, therefore a change of venue should not be granted. It is one of the crowning glories of our law that, no matter how guilty one may be, no matter how atrocious his crime, nor how certain his doom, when brought to trial anywhere, he shall, nevertheless, have the same fair and impartial trial accorded to the most innocent defendant. Those safeguards, crystallized into the constitution and laws of the land as the result of the wisdom of centuries of experience, must be, by the courts, sacredly upheld, as well in the case of the guiltiest as of the most innocent defendant answering at the bar of his country. And it ought to be a reflection, always potent in the public mind, that, where the crime is atrocious, condemnation is sure, when all these safeguards are accorded the

defendant, and therefore the more atrocious the crime, the less need is there for any infringement of these safeguards.

*Johnson*, 476 So. 2d at 1209 (quoting *Tennison v. State*, 79 Miss. 708, 713, 31 So. 421, 422 (1902)). Fourteen years later, we held that:

> The right to trial by an impartial jury is guaranteed by the organic law of the state, and *when it is doubtful* that such a jury can be obtained in the county of the venue of the homicide, the person on trial for his life is but asking for his rights when he requests a change of venue, and *there is no imaginable reason to refuse*, except, possibly, a slight additional cost to the county.

*Eddins v. State*, 110 Miss. 780, 70 So. 898, 899 (1916) (emphasis added). Stated differently, "there is no imaginable reason to refuse" a motion for change of venue where the ability for the defendant to be accorded a fair trial by an impartial jury is "merely doubtful." *Johnson*, 476 So. 2d at 1210 (citing *Eddins*, 70 So. at 899).

¶123. The accused has "a right to a change of venue when it is doubtful that an impartial jury can be obtained . . . ." *Johnson*, 476 So. 2d at 1211. "[U]pon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption." *Id.* However, this Court has "set forth certain elements which, when present would serve as an indicator to the trial court as to when the presumption is *irrebuttable*":

(1) Capital cases based on considerations of a heightened standard of review;

(2) Crowds threatening violence toward the accused;

(3) An inordinate amount of media coverage, particularly in cases of:

(a) serious crimes against influential families;

> (b)     serious crimes against public officials;
>
> (c)     serial crimes;
>
> (d)     crimes committed by a black defendant upon a white victim;
>
> (e)     where there is an inexperienced trial counsel.

*White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986) (emphasis added). Also to be considered is the size of the locality from which the venire is to be selected. *Rideau v. Louisiana*, 373 U.S. 723, 724, 727, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963) ("The record shows that such a thing as this never took place before in Calcasieu Parish, Louisiana.").

¶124.  At the hearing on the motion for change of venue, Cox presented his own affidavit and that of Christopher Tables.[23] Tables stated that he was aware Cox had been charged with murder, that he did not know Cox or any victims of the alleged crime, and that he had "heard talk in the community" regarding the crime. Tables concluded that, "because of the people involved, I do not believe [Cox] can get a fair trial in Union County."

¶125.  Also in support of the motion for change of venue, Cox presented various articles to the trial court. One, dated May 15, 2010, from the Northeast Mississippi *Daily Journal (Daily Journal)*, bore the title "Blue Springs hostage situation ends in woman being killed." The article detailed the events and informed the public that "[a]t the request of the Union County Sheriff's Department and Sherman Police Department[,] the Tupelo Police Department SWAT team and negotiator" raided the house and rescued the children, though "Kim Cox had already been shot to death before officers entered." Another *Daily Journal* article

---

[23]The motion for change of venue, itself, appears in the record, as does the affidavit of Christopher Tables. Cox's affidavit does not appear in the record.

55

published two days after the previous article and entitled "Formal charges expected today in hostage case" again related the details of Cox's alleged crime. On May 18, 2010, the *Daily Journal* reported that Cox had been charged with capital murder and three counts of kidnapping. On May 19, 2010, the New Albany *Gazette* reported Cox's charges, detailed the hostage situation, and pointed out that he had been "recently released from Pontotoc County Jail." Another article from the *Daily Journal* dated May 20, 2010, detailed the funeral of Kim Cox and, again, related details of the hostage situation: "[t]hat Kim Cox died a violent death could not be ignored at her funeral on Wednesday."

¶126. The State responded with four witnesses, each of whom professed a belief a fair jury could be impaneled. All four rebuttal witnesses remembered that a murder had taken place involving Cox. One of the State's witnesses testified as follows: "I remember them talking about, I guess you'd say, the defendant was in the house and they couldn't get him out and that he killed his, I don't know whether it was his ex-wife. I guess it was his wife or ex-wife. . . ." Moreover, three of the four witnesses knew the victim's father, Benny Kirk. One witness stated that Kirk was "pretty well known." Another stated that he "knew [Kirk] when he was a police officer" and that he "just knew him from being around the courthouse and around here all these years." Another of those witnesses who testified to knowing Kirk knew him well, "probably 20 years at least," and stated that Kirk was well known in the community as a police officer. It is of note that Melody Kirk, Kim's stepmother, also was in law enforcement.

¶127. The trial court denied Cox's motion for change of venue, observing that "I just feel like the State has sufficiently rebutted the argument and the motion . . . ." He noted that "[e]ven the Court lives South of Lee County and Tupelo and watches Channel 9 and reads the newspaper everyday about 4:30 in the morning, and I've not seen anything on this myself personally on television or read anything in the newspaper about it except when it happened." The majority affirms the ruling of the trial court, writing that "[t]he jury was empaneled in September 2012, more than two years and four months removed from the publication on the crime articles submitted in support."

¶128. No case, however, informs us, and the majority cites none, that a relevant factor to be considered is the length of time between the event and the trial. What is relevant to the consideration of the trial court is the presumption (which if a *White* factor is shown is irrebuttable) that an impartial jury cannot be obtained. That requires a careful consideration of the media coverage at the time of the event, the population of the venue, and whether such an event had taken place in that locale previously. *See Rideau*, 373 U.S. at 724, 727 (media coverage at issue occurred immediately following the alleged crime). Considering that trials often are fairly far removed from the events which give rise to them, if all that mattered was the time that had elapsed between the alleged crime and the trial, no motion for change of venue ever would be granted. With respect, that analysis ignores the fundamental constitutional issue at stake—a fair trial.

¶129. The present case involves a heinous capital murder in a county with a small population. The United States Census Bureau reports that Union County contained an

57

estimated population of 27,745[24] in 2013, the year after Cox's trial. *See* "Union County, Mississippi," United States Census Bureau, http://quickfacts.census.gov/qfd/states/28/28145.html (last visited June 24, 2015). At the time of the trial, the local newspapers reported that Kim Cox had been held hostage with her children by her husband, David Cox, that Kim Cox had been killed, and that local police had to call in a Tupelo SWAT team and a hostage negotiator. Members of the community who testified for the State at the hearing on the motion for change of venue recognized and remembered the case, and the victim's father, Benny Kirk, who was a well-known, well-respected law enforcement officer. This was a capital case involving "[a]n inordinate amount of media coverage" of a "serious crime[] against [an] influential famil[y] . . . ." **White**, 495 So. 2d at 1349. As such, the presumption of impossibility of impaneling an impartial jury should have been considered by the trial judge to have been *irrebuttable*.

¶130.  The majority, having paid but lip service to the heightened scrutiny with which we are bound to consider capital cases, concludes that "[t]he trial court did not abuse its discretion . . . ." Maj. Op. ¶ 27. In a notorious capital case such as this, due process requires that the trial court take extra precaution to protect the defendant's right to a fair trial. I find no imaginable reason for this motion for change of venue to have been denied. I find that the

---

[24] In **Rideau**, the population of Calcasieu Parish was approximately 150,000. **Rideau**, 373 U.S. at 724.

trial court abused its discretion by having denied the motion, and I would reverse and remand this case to the Circuit Court of Union County for a new trial in a different venue.[25]

## II.     Forensic Interview Video and L.K.'s Testimony

¶131.   Cox claims, as he did at trial, that the "inflammatory and unnecessary parading of L.K. before the jury" was more prejudicial than probative under Mississippi Rule of Evidence 403.

¶132.   A redacted copy of the forensic interview video of L.K., in which she described in lurid detail the horrors she endured on the night her mother was killed, was played before the jury. The video depicted a visibly (and understandably) distraught L.K., who indicated that the incidents of sexual assault upon her on the night in question took place in the presence of her dying mother. Prior to the publication of the video to the jury, Cox waived his right to cross examine L.K. Whether L.K. would or would not testify was then disputed: "Are you putting [L.K] on the stand for our purposes or are you putting her on the stand because you had questions for her? I thought the [prior] hearings we had on the [admissibility of] the video was so she would not have to testify. I don't have to question her." The trial court had ruled prior to the sentencing hearing that the video of the forensic interview was admissible under Mississippi Rule of Evidence 803(25), the tender-years exception, based on the child's mental and emotional age. The trial court noted, after having viewed the video *in camera*, that L.K. "held her hands up on her face several times during the interview, just pretty much

---

[25]I also would hold, because this heinous crime occurred very near the intersection of three counties (Union, Lee, and Pontotoc), that the retrial should not take place in Lee or Pontotoc Counties.

all the way through it. And she talked, and—she's now 14, but I still think she's a child of tender years."

¶133. Immediately following the publication of the video to the jury, the State called L.K. to the stand. Defense counsel objected:

> We have waived our confrontation issues so this is something completely out of the blue because I think we started down this journey probably two-and-a-half months ago, and the State's position jumping and screaming and bringing counselors and social workers in that [L.K.] shouldn't testify. It is not in her best interest. We agreed.

The State sought to elicit from L.K. testimony that her mother still was alive at the time Cox was sexually assaulting her for the purpose of establishing the especially heinous, atrocious, or cruel aggravator. Defense counsel replied that the video sufficiently proved what the State hoped to elicit from L.K. on the stand:

> Your Honor, at 2440 [of the forensic interview video], the question was asked, What was your mom saying? She said, Please don't. At 2510, What did David say? He told her to shut up. At 2520, What did he do? He made mama and little [D.C] watch. If that's not she's alive what is?

Defense counsel stated that "[w]e consider this repetitive testimony where it's irrelevant and that the prejudicial effect of it outweighs any probative value that it has."

¶134. The majority's suggestion that the trial court "provided Cox an opportunity to cross examine L.K., negating any constitutional claim of deprivation of the right to confront his accuser" is misplaced. Maj. Op. ¶ 34. My concern is not whether Cox had the opportunity to confront his accuser, which he admittedly waived so that L.K. would not have to testify. I am concerned that, in spite of Cox's waiver of his right to confront L.K., the State brought L.K.

forth to testify anyway. The State elicited the following from L.K. regarding the forensic interview:

> Q: I believe in that interview you talked about three sexual acts that David Cox did to you; is that correct?
>
> A: Yes, sir.
>
> Q: Was your mother alive and watching you during all of those three times?
>
> A: Yes, sir.

Just prior to this examination of L.K. by the State, the very same evidence had been presented to the jury in the form of the forensic interview video. The video showed L.K. informing the forensic interviewer that her mother had been made to watch the sexual acts Cox performed on her. Any further questioning about that by the State was, therefore, cumulative, repetitive, and wholly unnecessary to establish the especially heinous, atrocious, or cruel aggravator.

¶135. Mississippi Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or *needless presentation of cumulative evidence*." Miss. R. Evid. 403 (emphasis added). Here, the State presented sufficient evidence of the especially heinous, atrocious, or cruel aggravator, and then for no reason at all, except to highlight and bolster a portion of the minor victim's video interview, brought this victim to the stand to present the exact same evidence, over the strenuous objection of defense counsel. We have held that, "[a]ttorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to

employ tactics which are 'inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.'" *Flowers v. State*, 842 So. 2d 531, 553 (Miss. 2003) (quoting *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2001)).

¶136.  I can divine no other reason for the State's course of action other than a calculated attempt "to unduly influence the jury." *Id.* Because of the heightened scrutiny with which we are bound to consider death penalty cases, I would reverse the trial court's judgment, vacate the sentence and remand this case to the Circuit Court of Union County for a new trial.

**KING, J., JOINS THIS OPINION.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014). *following remand.

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*, 787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989); ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding; ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989); ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding; ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988); ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding; ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987); ***Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding; ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Manning v. State*, 158 So. 3d 302 (Miss. 2015).

*Byrom v. State*, 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*,  842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*, 784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

(Revised June 24, 2015.)